ANGELO FIOCCO, an Infant under the Age of Fourteen Years, by VINCENZO FIOCCO, His Guardian ad Litem, Respondent, *v.* AMOS D. CARVER and JOSEPH MORRELL, Appellants.

First Department, February 17, 1922.

Motor vehicles — negligence — boy who, with others, had been given ride on motor truck injured by starting of same before he got off — question of fact as to whether defendant's chauffeur was engaged in master's business at time of accident.

The court was not authorized to hold, as a matter of law, that the defendant's chauffeur was not engaged in the master's business at the time of the happening of the accident, where it appeared that the chauffeur, after delivering a load of goods, instead of taking the natural and direct route to the defendant's garage, drove to another part of the city to visit his mother, and upon coming out of the house and finding the truck loaded with boys who were holding a " block " party in the street, took them for a ride through the neighboring streets and, upon his return, got off the truck; that when he again got on the truck for the purpose of taking it to the garage he told all the boys to get off and repeated the command three times, but, before the plaintiff had gotten off, the truck started, catching his foot in the sprocket wheel and causing the injuries for which this action was brought.

CLARKE, P. J., and GREENBAUM, J., dissent, with opinion.

APPEAL by the defendants, Amos D. Carver and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 8th day of November, 1920, upon the verdict of a jury for $5,000, and also from an order entered in said clerk's office on the same day denying defendants' motion for a new trial made upon the minutes.

*William Butler* [*George F. Hickey* of counsel; *R. Waldo MacKewan* with him on the brief , for the appellants.

*William S. O'Connell,* for the respondent.

SMITH, J.:

The defendants' truck was being driven by a chauffeur on Cherry street in the eastern part of New York city at the time of the accident. The truckman had taken a load of goods from the defendants' place of business to Staten Island. On his return his natural and

First Department, February, 1922.        [Vol. 200

direct route would have been to have come from the Staten Island ferry on the west side of the city to the garage which was situated on Twenty-third street near Eleventh avenue. Instead of that he drove over to the east side of the city and stopped at Hamilton street to see his mother who was sick. Hamilton street and Cherry street run about at right angles to Catherine street. There were block parties upon both Hamilton and Cherry streets. After the chauffeur had been visiting his mother for about twenty minutes he came out and found the truck loaded with boys dressed up in fantastic costumes. He took these boys around different streets in the neighborhood for a drive and finally got back to the corner of Catherine street and Cherry street. There, according to the evidence of the plaintiff and one of his witnesses, the chauffeur stopped and got off from the truck and visited with a man in front of a pool room. When he got on to the truck he told the boys all to get off and repeated it three times. Some of them had gotten off. Before they had all gotten off, however, and before the plaintiff had gotten off, the truck started up. Plaintiff's foot was caught in a sprocket wheel and he suffered the loss of his leg, damages for which this action is brought. While the chauffeur was taking these boys for a ride around Catherine street and these other places he clearly was not engaged in his master's business. If the accident happened at that time then the plaintiff cannot recover. The jury were at liberty to conclude, however, that this frolic had stopped and that he had started back for his garage. Some question is made as to his driving up through Cherry street as not the most direct route from the place in question to the west side where the garage was situated, but the testimony of Hartnett is that Cherry and Water streets run parallel, that Cherry street is west of Water street. " Q. And a person who wanted to make from the east side over to the west side would go up through Water street to Catherine street and then turn into Cherry street and he would be going toward the west side, wouldn't he? A. Well, yes." It is true that Cherry street runs in a general direction northeast and southwest. But Cherry street runs up towards the bridge where there is an opening up through Canal street which is a broad street passing over to the west side of the city. It is not shown that the chauffeur had any purpose in going up Cherry street, other than to go to the garage. The chauffeur swears that after striking the boy he stopped and someone told him: " You had better keep going, Johnny, or you will be in dutch." He was then asked if he did keep on going and he answered that he did. " Kept right on going to the garage? A. Yes, sir. Q. That is where you were going when this accident happened, wasn't it? A. Yes, sir." It

is true that the chauffeur afterwards swears that he was not going to the garage at this time, but the jury might well have understood him to mean that he was not going to the garage by the most direct route from the ferry. He is not shown to have intended to make any other stops, and his direction to the boys to get off the car three times, at least, shows that he had ended his excursion for their pleasure. These facts, in view of the presumption of law that a servant in charge of his master's automobile is engaged in his master's business is sufficient to carry this case to the jury and upon which this verdict may rest.

In view of the decision of the Court of Appeals in *Riley* v. *Standard Oil Co.* (231 N. Y. 301), the latest decision of the Court of Appeals, we feel bound to hold that the question of the defendants' control of this car at the time of the accident was a question for the jury. In that case it was so held, even though the chauffeur's excursion for his private purpose was not yet ended. It is true in the case cited that the chauffeur had a load which he was required to deliver at the owner's place of business. In the case at bar he had the owner's automobile that he was required to deliver at the garage. The fact that in the *Riley* case he also had a load which he was required to deliver bears, as I view it, upon the question of fact which the jury is to determine, rather than upon a question of law, as to whether the truck was, at the time, in the control of the master. In this case, however, where the facts are such that the jury may well have found that the chauffeur had started for the garage at the time of the accident, where he was in duty bound to take the automobile, the court was not authorized to hold as matter of law that the chauffeur was not engaged in the master's business at the time of the happening of the accident.

The judgment and order should be affirmed, with costs.

LAUGHLIN and MERRELL, JJ., concur; CLARKE, P. J., and GREENBAUM, J., dissent.

CLARKE, P. J. (dissenting):

The plaintiff has recovered a verdict for personal injuries received, as is alleged, as the result of the negligence of the defendants' chauffeur. The chauffeur, Connelly, had been at work for the defendants as a chauffeur in charge of one of their trucks for about a year prior to the accident. It was a large electric truck with a left-hand drive used for the transportation of merchandise. It was covered, the distance from the street surface to the roof being eight and one-half feet. The height from the surface of the roadway to the underfloor boards three feet, six inches. The sides are of solid wood one foot, ten inches in height, above which are four slats

or racks along the side six inches apart. The power is transmitted by a sprocket and heavy chains to the rear wheels. Its speed is fifteen miles an hour. Defendant's garage was on the west side, at Twenty-third street and Eleventh avenue. On Saturday, October 26, 1918, a little after one o'clock Connelly left the defendant's place of business with some merchandise on the truck, went down to the Staten Island ferry and delivered his entire load at the American docks, pier 4, near St. George. He then came back on the Staten Island ferry. His route to the garage, his work being over for the day, was up West street to Twenty-third street and Eleventh avenue on the west side. Instead of going there he testified he came off the ferry, cut over to South street and cut straight down South street to Catherine slip, went up Catherine slip into Catherine street and turned to Hamilton street to his mother's home at 16½ Hamilton street. He left his truck in front of the house and went up to see his mother who was sick, and was in the house about twenty minutes. When he came down there was a block party going on in Hamilton street, the boys were dressed up in masquerade suits such as cowboys and Indians, and there was a crowd of them on his truck. They asked him for a ride. There was also a block party of the same kind going on in Cherry street. With the truckload of boys he turned around Hamilton street, went back to Catherine street into Catherine slip, turned around Catherine slip, went up through Cherry street, went down Market slip into Water street, got up Catherine slip and went up Cherry street and somebody stepped in front of him and stopped the car. The plaintiff was not one of the boys who asked him for a ride, he did not see him on the truck at any time, and the boys who were on came from Hamilton street and he knew most of them. The plaintiff lived on Catherine street.

There is no dispute in the evidence that these two block parties in Hamilton street and in Cherry street, with the boys of the said streets dressed up in the fantastic garb, were going on at that time. There is no dispute that there was a crowd of boys in and on his truck. There is no dispute that Connelly was giving these boys a ride around the neighborhood. The plaintiff himself testified that the truck was full of boys, " like sardines " and that they were dressed in costume. His cousin, who was seventeen years of age, testified that the car " was full up to the top step; there was somebody sitting with the chauffeur even. * * * It was all full. * * * They were * * * sitting on top of the roof." The policeman, Hartnett, testified that he had seen the truck on that day two or three times lumbering slowly along the street, down Catherine street, through Cherry and those adjoining streets,

going along at an easy pace, he noticed there were a number of children in the truck " dressed in different gaudy costumes like that of Uncle Sam and all those costumes," and that there were two block parties going on, one in Hamilton and one in Cherry street. The plaintiff, who was eleven years old at the time of the accident, testified that it was about four or half past four when he saw the auto come from Hamilton street into Catherine street; that it stopped near a pool room at 81 Catherine street, about a block away from where he lived; that the chauffeur got off and talked to somebody about a minute or so. " Some fellows got on, I seen them get on and I got on too, * * * on the side;" that about five boys got on with him; that he was on the truck about a few seconds; that he was hanging on the side " way up from the chain and the driver said to get off about three times. * * * While I was coming down the auto started and I felt something like pulling my leg, I felt something like pulling me down. * * * I was hollering ' stop, stop.' * * * I seen my leg all broken * * * caught on the chain;" that the auto went about one-half block before it stopped; that when he and the five boys went to get on the truck the inside of the truck was full, like sardines; that three of them tried to get on the same side with him; that two got on the tailboard which was up and they had to climb over it.

His cousin Lamarco testified that the truck came from Hamilton and swung down to Catherine street and it stood on the corner of Catherine and Cherry streets for a while. " I was on the sidewalk, so when the car stopped on the corner there, we just climbed on the truck, I climbed in the back and he [the plaintiff] climbed in the middle of the truck." He had been on a few seconds when the car started. Before the driver started " he told us to get off, so he was on Cherry street when he told us, so I was getting off, so my cousin was getting off, he was on top of the racks. As soon as I [heard] some screams, I told the chauffeur, I holler out, ' stop, stop.' "

These were the only witnesses as to the manner in which the accident occurred. The other witnesses for the plaintiff did not see the boy climbing up or getting on the truck, but only saw him after his leg was crushed.

The defendants' witnesses testify that the car did not stop before the accident; that they saw the boy running for it while it was in motion. So that the different theories presented were, on the plaintiff's side that the accident occurred because the chauffeur ordered the boys off after they were on and while it was in motion; and the defendants' that the boy was injured trying to get on by climbing up the side while it was in motion. So there is presented a question of fact upon conflicting evidence as to the

actual happenings of the accident, but, as I read the case, there is no dispute that the chauffeur, having finished his master's business, instead of going by the direct route on the west side of the town to his garage at Eleventh avenue and Twenty-third street, had, for his own purposes, namely, to visit his sick mother, gone up on the east side to Hamilton street and there had been induced, by the request of the boys of the neighborhood engaged in a frolic or block party, as it was called, to give them a ride on his truck three or four times around the neighborhood streets, and while doing that, a matter disassociated from any business of his master, the accident occurred.

It seems to me that the conclusion is inevitable, assuming that he was negligent in ordering the boys off while the car was in motion, that he was not then engaged in his master's business, and hence the defendants are not responsible therefor.    It is useless to cite cases, because the rule now seems to be laid down in *Riley* v. *Standard Oil Co.* (231 N. Y. 301) that " no formula can be stated that will enable us to solve the problem whether at a particular moment a particular servant is engaged in his master's business. We recognize that the precise facts before the court will vary the result.    We realize that differences of degree may produce unlike effects.    But whatever the facts, the answer depends upon a consideration of what the servant was doing, and why, when, where, and how he was doing it."

Thus it appears now that the question of liability depends upon the facts, and, as this court is charged by law with responsibility of reviewing the facts, I am of the opinion that upon no reasonable interpretation of the facts in the case at bar can the chauffeur at the time of this accident be held to have been about his master's business.    It follows, therefore, that the judgment ·and order appealed from should be reversed and the complaint dismissed.

GREENBAUM, J., concurs.

Judgment and order affirmed, with costs.